606 So.2d 1292 (1992)
STATE of Louisiana ex rel. Henry Lee TAYLOR
v.
John WHITLEY, Warden, Louisiana State Penitentiary.
No. 91-KH-2343.
Supreme Court of Louisiana.
October 19, 1992.
Dissenting Opinion October 20, 1992.
Rehearing Denied November 25, 1992.
Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., for appellant.
Ginger Berrigan, Gravel, Brady & Berrigan, Alexandria, for appellee.
Dissenting Opinion of Justice Dennis October 20, 1992.
MARCUS, Justice.
Henry Taylor was tried by a jury for aggravated rape in February, 1981. The jury instruction on reasonable doubt provided:
If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of the doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, yet if it does not establish it beyond a reasonable doubt, you must acquit the accused. This doubt must be a reasonable one, that is, one founded upon a real, tangible, substantial basis, and not upon mere caprice, fancy or conjecture. It must be such a *1293 doubt as would give rise to a grave uncertainty, raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendant's guilt. If, after giving a fair and impartial consideration to all of the facts in the case, you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty. The prosecution must establish guilt by legal and sufficient evidence beyond a reasonable doubt, but the rule does not go further and require a preponderance of testimony. It is encumbent upon the State to prove the offense charged, or legally included in the indictment, to your satisfaction and beyond a reasonable doubt. A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable man would seriously entertain. It is a serious doubt, for which you could give good reason. In other words, earlier in the case in the selection of the jury, I told you one of the things you should consider in the definition of reasonable doubt is when you have a doubt and you can assign a reasongive a reason for that doubt. That is reasonable doubt. [emphasis added].
The defense objected to this instruction. Taylor was subsequently found guilty as charged and sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. On January 25, 1982, this court affirmed Taylor's conviction and sentence on direct review. 410 So.2d 224 (La.1982). On November 13, 1990, the United States Supreme Court handed down Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991), which reversed our opinion in State v. Cage, 554 So.2d 39 (La.1989). The Court found an instruction equating reasonable doubt with a "grave uncertainty" and an "actual substantial doubt" and stating that what was required was a "moral certainty" that the defendant was guilty, was constitutionally defective. On February 2, 1991, Taylor filed an application for post-conviction relief in the trial court, alleging that the jury charge on reasonable doubt used in his case was unconstitutional in view of Cage. On May 6, 1991, this court decided State v. Cage, 583 So.2d 1125 (La.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991), on remand from the Supreme Court, in which we determined the erroneous instruction under Cage was subject to the harmless error analysis. On June 14, 1991, the trial judge denied defendant's application for post-conviction relief, stating:
DENIED. Defendant was not denied due process. Jury instructions were harmless as per harmless-error analysis.
Upon Taylor's application, we granted the writ.[1] We also granted a writ in State ex rel. Ellis Guillot v. John Whitley, Warden, and consolidated it with this case.
The sole issue before us is whether the United States Supreme Court's decision in Cage v. Louisiana should be applied retroactively to cases which were final at the time of the Court's decision.
In order to address the issue of retroactivity, we begin by tracing the evolution of the United States Supreme Court's decisions in this area. The Court began from the premise that the "federal constitution has no voice upon the subject" of retroactivity. Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Court concluded "that the Constitution neither prohibits nor requires" that retroactive application be given to any new constitutional rule, and proceeded to hold that its decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 61 L.Ed.2d 1081 (1961), did not require retroactive *1294 application. In doing so, the Linkletter Court set forth a three-pronged analysis to determine retroactivity: (a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Linkletter test was applied to final convictions, and convictions at various stages of trial and direct review. Nonetheless, the application of the Linkletter test led to confusion, and was criticized as creating "incompatible rules and inconsistent principles." Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1968) (Harlan, J. dissenting). In an attempt to resolve this problem, Justice Harlan suggested a new test in Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1970) (separate opinion of Harlan, J.). In his view, one of the most important policies in this area was finality:
It is, I believe, a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view. Id. at 690, 91 S.Ct. at 1179.
Accordingly, he proposed a general principle whereby "all constitutional errors not waived or harmless are correctable on habeas and by defining such errors according to the law in effect when a conviction became final." Id. at 692, 91 S.Ct. at 1179 (emphasis added). Under this general principle, new rules would not be given retroactive effect on collateral review, although they would be applied to cases pending on direct review. However, Justice Harlan created two exceptions in which he would give retroactive effect to new rules on collateral review. The first exception involved new substantive due process rules i.e., rules placing certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe. The second exception referred to new rules which required observance of "those procedures that ... are implicit in the concept of ordered liberty" and altered our understanding of the "bedrock procedural elements" of a fair trial. As an example of this second exception, Justice Harlan cited Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).
In the next several years, the Court began to gradually move away from Linkletter and toward the analysis suggested by Justice Harlan. The Court began by adopting Justice Harlan's view that a new rule should be applied retroactively to all cases pending on direct review. Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); United States v. Johnson, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). In Yates v. Aiken, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988), the Court was asked to adopt Justice Harlan's retroactivity views in the context of a collateral review case. The issue in Yates was whether the rule announced in Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), should be applied to a defendant whose case was final at the time Franklin was decided. The Court found it unnecessary to reach the issue of retroactivity, finding that Franklin was not a new rule, but merely an application of the principle that governed its decision in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which was decided before defendant's trial took place. Several months after Yates, the Court in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1988), finally adopted Justice Harlan's view of retroactivity for cases on collateral review. In Teague, the defendant argued that he should receive the benefit of the Court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), even though his conviction was final at the time Batson was decided. The Court began by considering what type of decision was a "new rule" for retroactivity purposes:
It is admittedly often difficult to determine when a case announces a new rule, *1295 and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. 489 U.S. at 301, 109 S.Ct. at 1070 (citations omitted; emphasis in original).
The Court went on to find that Batson's application of the fair cross section requirement to the petit jury was a new rule, since under its prior decisions, fairness in jury selection had never been held to require proportional representation of races upon a jury. Having found Batson created a new rule, the Court then stated that under Justice Harlan's analysis, it should not be retroactively applied to a case final at the time it was decided, unless it fell under one of the two exceptions. The Court agreed that the first exception (a rule placing certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe) was not applicable. Justice Harlan's second exception would give retroactive application to new rules which required "the observance of those procedures that are implicit in the concept of ordered liberty." 489 U.S. at 310, 109 S.Ct. at 1075. The Court applied this exception with a modification, noting that Justice Harlan clearly intended this second exception to be reserved for "watershed rules of criminal procedure." Id. The Court concluded that this second exception did not apply in the case before it, noting that "adoption of the rule petitioner urges would be a far cry from the kind of absolute prerequisite to fundamental fairness that is `implicit in the concept of ordered liberty.'" Id. at 314, 109 S.Ct. at 1077.
Thereafter, the Court has concentrated on applying and refining the Teague analysis. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), applied the Teague rule in a capital sentencing context. In Butler v. McKellar, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), the Court dealt with the issue of whether its opinion in Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), was a new rule under Teague. The defendant argued that Roberson was not a new rule, but was merely an application of the earlier case of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court admitted that the Teague definition of a new rule as one which "breaks new ground or imposes a new obligation" could be difficult to apply where the new decision was reached by an extension of the reasoning of previous cases. Nonetheless, the Court distinguished between situations where a decision was dictated by a precedent existing at the time the defendant's conviction became final (which would preclude the decision from being a new rule) and situations were a decision was merely controlled by existing precedent (which would not preclude the decision from being a new rule):
But the fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under Teague. Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when aware of reasonable contrary conclusions reached by other courts. In Roberson, for instance, the Court found Edwards controlling but acknowledged a significant difference of opinion on the part of several lower courts that had considered the question previously. 486 U.S., at 679, n. 3., 108 S.Ct., at 2097, n. 3. That the outcome in Roberson was susceptible to debate among reasonable minds is evidenced further by the differing positions taken by the judges of the Courts of Appeals for the Fourth and Seventh Circuits noted previously. It would not have been an illogical or even *1296 a grudging application of Edwards to decide that it did not extend to the facts of Roberson. We hold, therefore, that Roberson announced a "new rule." 494 U.S. at 415, 110 S.Ct. at 1217-18.
The Court went on to find that neither of the two exceptions applied; therefore, it refused to give retroactive effect to the Roberson rule. The Butler definition of a new rule was further refined by the Court in Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990):
"The `new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." Butler, supra, 494 U.S., at 415, 110 S.Ct., at 1217. Under this functional view of what constitutes a new rule, our task is to determine whether a state court considering Parks' claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule Parks seeks was required by the Constitution. Id. 494 U.S. at 488, 110 S.Ct. at 1260.
The Court answered this question in the negative, finding the relief sought by Parks would necessitate the creation of a new rule. In Sawyer v. Smith, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), the Court gave some guidance on the application of the second Teague exception:
In Teague, we modified Justice Harlan's test to combine the accuracy element of the Desist test with the Mackey limitation of the exception to watershed rules of fundamental fairness. It is thus not enough under Teague to say that a new rule is aimed at improving the accuracy of trial. More is required. A rule that qualifies under this exception must not only improve accuracy, but also "alter our understanding of the bedrock procedural elements" essential to the fairness of the proceeding. Id. at ___, 110 S.Ct. at 2831 (emphasis in original).
The Court rejected Sawyer's claim, finding it did not come under either Teague exception.
Turning now to our state law decisions on retroactivity, we find they have also recognized the principle that the constitution does not prohibit nor require courts to give retroactive application to criminal law decisions. State v. St. Pierre, 515 So.2d 769, 774 (La.1987). Our cases decided after Linkletter reflect the confused state of the law under that case. In State v. Rester, 309 So.2d 321 (La.1975), we wrote:
Opinions concerning retroactive or prospective application of new-found constitutional rights are not good subjects for careful analysis. They tend only to the conclusion that their results are dictated less by law and reason than by expedient judicial administration. Except where the new rule is said to go to "the very integrity of the fact-finding process" (Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965)), the cases do not force retroactive application of the new rule. 309 So.2d at 323.
See also State v. King, 347 So.2d 1108 (La.1977); State v. Liesk, 326 So.2d 871 (La.1976) (on rehearing). Subsequently, our cases have followed Griffith v. Kentucky, supra, and have applied new rules to cases pending on direct review or not yet final. See State v. Sanders, 523 So.2d 209 (La.1988); State v. St. Pierre, 515 So.2d 769 (La.1987). In fact, we recently applied the Cage rule to a case pending on direct appeal at the time Cage was rendered. State v. Smith, 600 So.2d 1319, 1326 n. 5 (La.1992). However, we have yet to consider the issue of retroactivity on collateral review in light of Teague. We now do so, and adopt the Teague standards for all cases on collateral review in our state courts.
In doing so, we recognize that we are not bound to adopt the Teague standards.[2] *1297 However, we find the Linkletter test, generally followed by our courts in the past, is vague and leads to the possibility of inconsistent results. Further, we find the consideration of finality in criminal proceedings, so well enunciated by Justice Harlan in Desist and Mackey, is equally applicable in state proceedings as well as federal proceedings. Given our overcrowded state judicial system, Justice Harlan's words in Mackey on the need for finality ring very true today:
A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. This drain on society's resources is compounded by the fact that issuance of the habeas writ compels a State that wishes to continue enforcing its laws against the successful petitioner to relitigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first. Mackey, 401 U.S. at 691, 91 S.Ct. at 1179 (separate opinion of Harlan, J.) (citations omitted).
Accordingly, we now adopt Justice Harlan's views on retroactivity, as modified by Teague and subsequent decisions, for all cases on collateral review in our state courts.
Having set forth the relevant standard, we now turn to the merits of the present case. As a threshold consideration, we must determine whether the United States Supreme Court decision in Cage v. Louisiana set forth a new rule. We have little doubt that the Court's decision in Cage was controlled by its earlier decision of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (requiring the reasonable doubt standard), which was in effect at the time defendant's conviction became final. However, as noted by Butler and Saffle, it is not conclusive for purposes of deciding whether the current decision is a new rule for the decision simply to be controlled by an earlier case. Rather, a decision will announce a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. We are unable to say the result in Cage was dictated by Winship. First, while Winship requires the reasonable doubt standard, it says nothing about the content of the jury instruction on that standard, or even whether the trial court should attempt to guide the jury's implementation of that standard. Second, we believe the outcome of Cage was "susceptible to debate among reasonable minds." Butler, 494 U.S. at 415, 110 S.Ct. at 1217. Over one hundred years ago, in Miles v. United States, 103 U.S. 304, 26 L.Ed. 481 (1880), the Court dealt with a jury charge which stated: "[p]roof beyond a reasonable doubt is such as will produce an abiding conviction in the mind to a moral certainty...." In finding no error in the instruction, the Court wrote:
The evidence upon which a jury is justified in returning a verdict of guilty must be sufficient to produce a conviction of *1298 guilt, to the exclusion of all reasonable doubt. Attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury. The language used in this case, however, was certainly very favorable to the accused, and is sustained by respectable authority. Id. 103 U.S. at 312.
Likewise, a reasonable doubt instruction using the term "moral certainty" was found to be "sufficiently favorable" to the defendants in Wilson v. United States, 232 U.S. 563, 570, 34 S.Ct. 347, 349, 58 L.Ed. 728 (1913). In Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), decided eight years after Winship, the Court found a jury instruction defining reasonable doubt as "a substantial doubt, a real doubt" was unclear, but not reversible error:
The trial court's truncated discussion of reasonable doubt, however, was hardly a model of clarity. It defined reasonable doubt as "a substantial doubt, a real doubt." This definition, though perhaps not in itself reversible error, often has been criticized as confusing. Id. at 488, 98 S.Ct. at 1936 (emphasis added).
The cases from our court have reached a similar conclusion. In State v. Stramiello, 392 So.2d 425, 429 (La.1980), we found an instruction using the phrase "grave uncertainty" in a reasonable doubt instruction was "neither erroneous nor prejudicial" when the charge was considered in its entirety. In State v. Monroe, 397 So.2d 1258, 1269 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1982), we found a trial judge's characterization of reasonable doubt as involving "serious doubt" and "grave uncertainty," when viewed in the context of the entire charge, was an "accurate statement of the law." In State v. Taylor, 410 So.2d 224 (La.1982), the direct appeal in the instant case, we concluded the charge using the phrases "grave uncertainty" and "moral certainty" to define reasonable doubt could create some confusion, but was not reversible error:
We agree that the charge is lengthy and to some degree repetitious, and that some of the statements, if taken alone out of context, may tend to create some apparent confusion, but taken as a whole, we conclude that reasonable persons of ordinary intelligence would have no problem in understanding the definition of "reasonable doubt." Id. at 225.
Taylor was decided on January 25, 1982. Less than one month later, on February 19, 1982, we decided State v. McDaniel, 410 So.2d 754 (La.1982). In McDaniel, we disapproved of an instruction defining reasonable doubt as "a doubt that would give rise to a great uncertainty" and "one that would make you feel morally uncertain as to the defendant's guilt." We reversed McDaniel's conviction and sentence based upon both the reasonable doubt language, and upon a portion of the charge that prohibited the jury from going beyond the evidence to seek doubts upon which to acquit the defendant, a charge we had previously held to be erroneous in State v. Mack, 403 So.2d 8 (La.1981). After the McDaniel decision, Taylor applied for a rehearing. We denied rehearing on March 12, 1982. As a result, Taylor, not McDaniel, appeared to be the controlling opinion.[3] Subsequently, we followed the Taylor reasoning in State v. Messiah, 538 So.2d 175, 184 n. 5 (La.1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990), and in the direct appeal of Tommy Cage in State v. Cage, 554 So.2d 39, 41 (La.1989). While we recognize that our reasoning was *1299 ultimately rejected by the United States Supreme Court, we believe our earlier decisions reflected "reasonable, good-faith interpretations of existing precedents." Butler, 494 U.S. at 415, 110 S.Ct. at 1217. Based on our review of the cases of the United States Supreme Court and those of our court, we are unable to say that the result of Cage v. Louisiana was dictated by Winship or by any other precedent existing at the time defendant's case became final. Winship set out the reasonable doubt standard, but did not give any guidance on the language to be used in the instruction.[4] No case prior to Cage found the instruction to be reversible error, except for a portion of the holding in McDaniel, which was not followed by our court in later decisions. Hence, we conclude Cage v. Louisiana is a new rule.
Having found that Cage v. Louisiana announced a new rule, we now consider whether it comes under one of the two recognized exceptions in Teague under which a new rule is available on collateral review. The first exception, that a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe, is clearly not applicable in this case. The second exception requires that a new rule should be applied retroactively if it requires the observance of those procedures that are implicit in the concept of ordered liberty. As the Court has repeatedly pointed out, this exception is reserved for "watershed rules of criminal procedure" and rules which will "alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction." Teague, 489 U.S. at 311, 109 S.Ct. at 1075-76. As an example of the type of rule coming within this exception, the Court has cited Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Saffle, 494 U.S. at 495, 110 S.Ct. at 1264. The Court has stated that it believes it is "unlikely that many such components of basic due process have yet to emerge." Teague, 489 U.S. at 334, 109 S.Ct. at 1077. Given these holdings, we are unable to say Cage v. Louisiana is the type of new rule which should fall within the second exception. It does not set forth a watershed rule of criminal procedure such as Gideon did, nor does it alter our understanding of the bedrock procedural elements of a fair trial.[5] In giving the Cage instruction, our trial courts did not fail to give, nor attempt to alter, the reasonable doubt standard set forth in Winship. Rather, they tried, in good faith, to explain the term reasonable doubt using phrases which in the past had been approved by the United States Supreme Court and this court. We believe the Court's decision in Cage v. Louisiana set forth a new rule designed to give guidance to these courts in the future and eliminate the possibility of juror confusion. It did not attempt to create a new procedure "without which the likelihood of an accurate conviction is seriously diminished." Teague, 489 U.S. at 313, 109 S.Ct. at 1076. For these reasons, we find Cage v. Louisiana does not fall under the second Teague exception. Accordingly, it cannot be retroactively applied in defendant's action for *1300 post-conviction relief.[6]
Finally, we note that the only two federal circuits to address this issue have both concluded that Cage announced a new rule which did not fall under either of the Teague exceptions and therefore should not be applied retroactively. Adams v. Aiken, 965 F.2d 1306 (4th Cir.1992); Skelton v. Whitley, 950 F.2d 1037 (5th Cir.1992). The United States Supreme Court recently denied Skelton's petition for certiorari. ___ U.S. ___, 113 S.Ct. 102, 121 L.Ed.2d 61 (1992). Therefore, the decisions of the federal courts are in line with our holding in the present case.
In sum, we hold that the retroactivity standards set forth in Teague v. Lane are applicable to our state courts in cases on collateral review. Applying those standards, we find Cage v. Louisiana set forth a new rule. Since we find neither of the Teague exceptions apply in the present case, we hold defendant is not entitled to raise the Cage issue on post-conviction relief. As a result, the trial court did not need to reach the issue of harmless error, but reached the correct result in denying post-conviction relief.

DECREE
For the reasons assigned, the judgment of the trial court denying post-conviction relief is affirmed.
LEMMON, J., concurs and will assign reasons.
CALOGERO, C.J., dissents.
DENNIS, J., dissents with reasons.
CALOGERO, Chief Justice, dissenting.
Taylor's trial jury was erroneously given a jury instruction that allowed the jurors to convict him on a degree of proof below that required by the Due Process Clause. Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991). Taylor did not dally in his complaint about this erroneous jury instruction. He filed appropriate pre-trial motions, objected at trial, appealed his conviction, and assigned error with this Court on his direct appeal. State v. Taylor, 410 So.2d 224 (La.1982). Moreover, Taylor watched a fellow inmate prevail on the same issue after he had raised it. State v. McDaniel, 410 So.2d 754 (La.1982). Well before the McDaniel opinion, Taylor had attempted to rectify the consequences of the erroneous jury instruction. To add insult to injury, Taylor's conviction did not become final until after this Court's decision in McDaniel, for this Court denied Taylor's application for rehearing filed subsequent to this Court's decision in McDaniel. Taylor's well supported argument was rejected at every stage, including now, post-conviction.
This defeat has been caused by the majority's adoption in this case of the retroactivity analysis that the United States Supreme Court has only recently embraced. See Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1988); Butler v. McKellar, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). I would not abandon Louisiana's established rule on retroactivity concerning federal constitutional rights in criminal cases.
Louisiana's established retroactivity analysis derives from the Linkletter-Stovall criteria announced earlier by the United States Supreme Court. Regarding the enforcement of newly announced rules of Federal Constitutional dimensions, the decision on which criteria to use to determine whether retroactive rather than simply prospective application should be required, is a state determination. See Cowell v. Leapley, 458 N.W.2d 514 (S.D.1990). The United States Supreme Court has recognized *1301 that a state may determine whether to apply constitutional law provisions retroactively. Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601, 608 (1965); Great Northern Railway v. Sunburst Oil Refining Co., 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366 (1932). The fact that the Federal courts have abandoned the Linkletter-Stovall criteria does not compel this Court to do the same.
The new restrictions imposed by Federal Courts on state prisoners seeking relief from their state convictions on federal constitutional grounds has placed an increased importance on the availability of a state forum in which to pursue these claims. As the federal courts eliminate the availability of federal habeas corpus review of state convictions, a state prisoner can only hope to vindicate his constitutional rights through state collateral proceedings.
In adopting new criteria for the determination of retroactive application of criminal constitutional law, the federal courts have indicated that their reduced intrusion into state criminal process is motivated by concerns of federalism and comity. See generally Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1988). State courts should not blindly adopt these new criteria, because the concerns of federalism and comity are absent from state criminal court proceedings.
Moreover, Louisiana Constitution Article I § 21 provides that "[t]he writ of habeas corpus shall not be suspended." And Louisiana Code of Criminal procedure article 930.3(1) provides:
If the petitioner is in custody after sentence for conviction of an offense, relief shall be granted only on the following grounds:
(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana.
According to the United States Supreme Court's decision in Cage, Taylor's conviction was obtained (by virtue of, in part, a violation of his federal due process rights) because of the erroneous jury instruction. As a result, these provisions of the Louisiana Constitution and statutes mandate the retroactive application of Cage.
In a per curiam opinion, the United States Supreme Court emphasized that
[T]he reasonable-doubt standard is a "prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocencethat bedrock `axiomatic and elementary' principle whose `enforcement lies at the foundation of the administration of our criminal law....' Due process commands that no man shall lose his liberty unless the Government has borne the burden of `... convincing the factfinder of his guilt.' To this end, the reasonable-doubt standard is indispensable, for it `impresses on the trier of fact the necessity of reaching a subjective state of the certitude of the facts in issue.'"
Ivan V. v. City of New York, 407 U.S. 203, 204-05, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972) (citations omitted). Accordingly, the rule announced by the United States Supreme Court in Cage demands retroactive application since it directly affects the fact finder's function.
I am well aware of the fear that "the gates of the penitentiary may be flung open" for prisoners who were subjected to the same erroneous reasonable doubt jury instruction. That fear is not well founded. This Court has already barred the great majority of such possible complaints when it decided to permit a harmless error application. State v. Cage, 583 So.2d 1125 (La. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991). Now, in situations where the error is not harmless, the defendant is being told that post-conviction relief is unavailable to him. A harsh consequence of this decision is that Henry Taylor is left without a forum to test the impact of the Cage error, which affected the fundamental fairness of his trial. Taylor's only fault on direct appeal was that he *1302 made the correct argument nine years before its time.
I think that this decision is unnecessary and unwise. More importantly, for reasons stated above, I believe the decision of the majority is wrong. I dissent for these reasons and because I am of the view that the error in this case was not harmless.
DENNIS, Justice, dissenting.
I respectfully dissent.
The majority adequately relates the procedural and factual history of Taylor's case in its opinion. The majority errs, in my opinion, when it rejects long standing state precepts and adopts a newly devised federal standard for retroactive application of constitutional decisions and grafts it upon state habeas proceedings.
The majority opinion's complete, uncritical adoption of the latest change in federal habeas corpus law is ill-conceived and unwarranted. The majority opinion disregards the present body of Louisiana Habeas Corpus legislation that was carefully crafted by the legislature in post conviction relief procedures, and mandated by the people in their state constitution; misunderstands the United States Supreme Court's teachings on federalism which call for more, not less, reliance upon state law; and mistakenly assumes that more clarity and finality is to be found in the federal jurisprudence than in our own state habeas law.
Applying the Law to the Issue
As the majority states, the fundamental issue presented in this post conviction relief case is whether or not this court should apply the decision in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991), retroactively in order to afford relief to Taylor, whose case was constitutionally flawed in a similar manner. The resolution of that issue, however, does not require the application of federal habeas decisions. This matter arises under state post conviction proceedings and therefore should be decided according to state law. What the majority does is to, in effect, abdicate the responsibility of this court to say what the law of this state is in state post conviction cases. The majority, without assessment or recognition of any difficulty by this court in applying our well settled state standard, mimics the actions of the United States Supreme Court, adopting a federal standard designed to encourage states to find and exercise their own standard, not to rotely duplicate the federal law.
In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1988), upon which the majority is wholly reliant, the High Court abandoned its previous standard of over 20 years in favor of a standard designed to lend more finality to criminal proceedings. See Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The High Court's motivation for adopting such a restrictive standard of retroactive application in Teague lies in notions of federalism and comity. Teague, supra, 489 U.S. at 310, 109 S.Ct. at 1075. See also Friedman, Habeas and Hubris, 45 Vand.L.Rev. 797 (1992). As Justice O'Connor stated in Teague:
The "costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus ... generally far outweigh the benefits of this application." In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, for it continually forces the States to marshall resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards. Furthermore, ... "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands."
Teague, Id. (citations omitted) (emphasis and omissions in the original). The High *1303 Court accepted the need for less federal interference with the finality of state criminal proceedings and convictions as outweighing the benefits of equal justice in the retroactive application of its federal constitutional decisions. But the justice in our applying a less restrictive retroactivity rule in state habeas cases is not exceeded in weight, value or importance by any need for more finality in proceedings or convictions at the state level. This is obvious, because there is no finality problem in our state habeas system, as clearly evidenced by the majority's failure to even attempt to demonstrate one. Furthermore, the majority's replication of the United States Supreme Court's rule in this area does not promote the goals of federalism; instead, in self-defeating circularity, the majority blindly replicates the very federal habeas rule by which the High Court attempts to accord comity to our state laws and decisions.
Additional indication of the motivation of the federal courts in this area is gained by examining the area of retroactivity in civil applications. In James B. Beam Distilling Co. v. Georgia, ___ U.S. ___, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), the majority decided that, in the civil context, choice of law requires that "when the court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata." James B. Beam, supra, at ___, 111 S.Ct. at 2448. In so stating, the High Court abandoned the analysis it devised in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The court found little difficulty in condoning retroactive application of decisions to most civil proceedings because of the lack of any forum for collateral review. It recognized the inherent disservice done when application is made to one party in one case, but not to another in a similar case simply because of timing or because the unreviewed case passed in the stream of applied for relief without being drawn up for review. Compare Mackey v. Unites States, 401 U.S. 667, 679, 91 S.Ct. 1160, 1173, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). Furthermore, at least three Justices ascribed to the principle that the constitutional division of governmental power did not allow the courts to chose among prospectivity and retroactivity because the courts "discern[] what the law is, rather than decreeing what it is today changed to, or what it will tomorrow be." Beam, supra, ___ U.S. at ___, 111 S.Ct. at 2451 (Scalia, J., concurring in the judgment) (emphasis in the original). See also Art. III, § 1 of the United States Constitution; Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803).
From this decision in the civil context, it can be seen that the decision in Teague, and its progeny, was motivated by responsibilities of federalism and comity incumbent upon the Supreme Court in its relationship to fifty sovereign state governments. In truth, the Supreme Court has abdicated its position at the forefront of the protective Writ of Habeas Corpus in favor of allowing the states to assume this role in a manner consistent with state constitutions and laws. Regardless of whether one agrees that federalism and comity should be pursued to such extreme lengths by the United States Supreme Court, there is no justification for a state supreme court to imitate the High Court in this respect. Obviously, the impact of a state court's decision beyond its own system is minuscule in comparison to that of the Supreme Court decisions.
Furthermore, the state constitution establishes that "the writ of habeas corpus shall not be suspended." La. Const. art. I, § 21. Moreover, it provides that "[a] judge may issue writs of habeas corpus ... in aid of the jurisdiction of his court." La. Const art. V, § 2. The legislature of this state has implemented a careful statutory scheme for post conviction relief designed to control repetitive and spurious habeas petitions yet still provide review to those whose convictions were obtained as the result of fundamental unfairness and *1304 through a lack of due process guaranteed by our state constitution. See La.Code Cr. Pro. arts. 924 et seq. In the face of such conscientious effort by the legislature to guarantee a fair, workable system for collateral review of state convictions, we should not be so precipitant in adopting federal standards for retroactivity. That case is even stronger where the federal standards are not adopted as the result of any constitutional mandate, depend upon notions of federalism and comity for their purposeful meaning, and defer to the state courts for the implementation of state law precepts, not the adoption of federal precepts.
Additionally, the majority accepts the federal standard mistakenly believing that this standard will impart "finality" through "clarity." Nothing could be further from reality. Adopting exceptions which rely on such ambiguous tests as "bedrock procedural elements," "watershed rules" and whether rules are "dictated" by precedent lends nothing to refining clarity in these proceedings. Rather, it blindly accepts a solution to a federal problem perceived by a minority of the United States Supreme Court, despite the fact that no such problem exists in our state system. Notably absent from the majority decision is any indication that the previous standard was creating a problem for the judiciary of this state in its application. And the majority cannot rightly claim that it has now clarified that standard to a degree where we can readily ascertain which errors will be applied retroactively and which will not.
Taylor's Post Conviction Relief Case
If anything in the criminal law is a "watershed" principle, it is that we scrupulously maintain the reasonable doubt standard. Such a standard, long ago approved in this state, State v. Bazile, 50 La.Ann. 21, 23 So. 8 (1898), substantially affects the fact-finding process, and should be given full retroactive effect. State v. Sanders, 523 So.2d 209 (La.1988); State v. St. Pierre, 515 So.2d 769 (La.1987). To find that Cage announces a new rule, not "dictated" by precedent, is to ignore the long established acceptance of the reasonable-doubt standard and to penalize Taylor for our own failure to heed the teachings of the past. It has long been recommended that the courts of this nation not attempt to muddy the standard through jury charges which cannot adequately explain something that requires little explanation. See 9 Wigmore on Evidence § 2497 (3d ed. 1940). See also State v. McDaniel, 410 So.2d 754 (La.1982); C. Joseph & R. Lamonica, Louisiana Judges' Benchbook 3.3 (3d ed. 1985); State v. Sullivan, 596 So.2d 177, 193 (La.) (DENNIS, Justice, dissenting), cert. granted, ___ U.S. ___, 113 S.Ct. 373, ___ L.Ed.2d ___ (1992). This court has pronounced that such a jury charge as the one at issue here, cannot possibly benefit the jury when compared to the charge's likelihood of misleading and confusing the jurors. State v. McDaniel, 410 So.2d 754 (La.1982).
Furthermore, the majority's statement that the denial of rehearing in Taylor was the judgment of the regular seven member court and therefore the prevailing law is incorrect and unwise. That statement implies that any decision of this court in which a justice ad hoc or pro tempore participated is inherently suspect or vulnerable because the precedent represented by that decision was not the judgment of the full seven member court. Such an interpretation is inherently hubristic, undermines precedent and stare decisis by creating a hierarchy of state supreme court decisions, and does not comport with any jurist's notion of the validity of cases previously adjudicated by this court. Furthermore, it does not augur well for our ability to command respect for this court's jurisprudence during the approaching "Eighth Justice" period of our judicial history. See La.Acts 1992, No. 512.
NOTES
[1] 595 So.2d 642 (La.1992).
[2] The states which have thus far addressed the Teague issue are divided. In Cowell v. Leapley, 458 N.W.2d 514 (S.D.1990), the Supreme Court of South Dakota rejected the Teague rule and continued to apply its state rule which was derived from Linkletter. Nonetheless, the court reached the same result under its rule as it would have under Teague. In State v. Slemmer, 170 Ariz. 174, 823 P.2d 41 (1991), the Supreme Court of Arizona chose to follow Teague for issues of state law, finding the "law regarding retroactivity is complex enough without requiring counsel and trial judges to apply different retroactivity rules...." Id. at 182, 823 P.2d at 49.
[3] Both Taylor and McDaniel were "split-panel" decisions, in which two seven member panels of this court were temporarily created, consisting of four supreme court justices and three court of appeal judges (sitting as justices ad hoc), each panel hearing one-half of the criminal cases argued each cycle. See State v. Petterway, 403 So.2d 1157, 1160 (La.1981). For the sake of consistency, all rehearing applications were considered by the seven regular members of the supreme court. Id. at 1161. Therefore, the denial of rehearing in Taylor was the judgment of the regular seven member court.
[4] Of course, if the trial judge's instruction had omitted any mention of reasonable doubt, we would find his instruction contrary to the result dictated by Winship. In such a case, it would be unnecessary to decide if Cage created a new rule, since the result would be already dictated by Winship. See, e.g., Yates v. Aiken, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988). In the present case, however, the trial judge's instruction followed the reasonable doubt standard, although he used terms later found to be erroneous.
[5] Moreover, the previous holdings that the Cage error can be harmless, State v. Cage, 583 So.2d 1125 (La.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991), and that the Cage error is subject to the requirements of the contemporaneous objection rule in non-capital cases, State v. Dobson, 578 So.2d 533 (La.App. 4th Cir.1991), writ denied, 588 So.2d 1110 (La. 1991), support our conclusion that Cage is not a watershed rule of criminal procedure, nor does it alter our understanding of the bedrock procedural elements of a fair trial.
[6] At oral argument, counsel for Taylor joined in the argument raised by the counsel for Guillot that this case should be decided on the basis of La.Code Crim.P. art. 930.8. For the reasons assigned in the Guillot case, handed down this date, we find no merit to this argument. See State of Louisiana ex rel. Ellis Guillot v. John Whitley, Warden, 606 So.2d 1305, 1306 n. 3 (La.1992).