648 So.2d 1272 (1994)
STATE of Louisiana,
v.
Norman SANDERS.
No. 93-KA-0001.
Supreme Court of Louisiana.
November 30, 1994.
Rehearing Denied January 26, 1995.
*1276 Nicholas J. Trenticosta, Gary P. Clements, New Orleans, for applicant.
Richard P. Ieyoub, Atty. Gen., Douglas H. Greenburg, Dist. Atty., Mark D. Rhodes, Juan W. Pickett, Kristi S. Maiorana, Houma, for respondent.
HALL, Justice[*].
On January 5, 1990, defendant, Norman Sanders, was charged by grand jury indictment with first degree murder of "Jamie Pitre and Kellie Pitts Sanders." The indictment was later amended to clarify that the indictment charged two counts of first degree murder. Defendant was convicted on both counts and sentenced to death. This case is now before us on automatic appeal pursuant to LSA-Const. art. V, § 5(D)(2).
Defendant has presented 34 assignments of error, of which 20 were argued. These 20 principal assignments of error will be discussed in this opinion and the 14 remaining unargued assignments of error will be discussed in an unpublished appendix.
For reasons assigned in this opinion, we affirm the convictions, but reverse and set aside the sentence and remand for a new sentencing hearing.

FACTS
On October 13, 1987, Terrebonne Parish authorities found the bodies of two homicide victims, Jamie Pitre and Kelly Pitts Sanders. The facts surrounding the victims' deaths, as developed at defendant's trial, follow.
Defendant, Norman Sanders, and Kelly Pitts, one of the victims, married in September 1986. In September 1987, then 18-year-old Kelly left the house she shared with defendant and moved in with her mother and sister. Defendant subsequently threatened to kill Kelly and her whole family if she did not return to him. On September 21, 1987, Kelly filed for a legal separation from defendant and for a restraining order preventing him from threatening or approaching her.
On October 12, 1987, stating that he wanted to take pictures of Kelly with another man for use in divorce proceedings, defendant enlisted the help of two friends to find Kelly. One of the friends informed defendant that he knew of Kelly's whereabouts, and that she had been seen in the company of a young man, Jamie Pitre. Defendant's two friends showed him the home of Ronnie Pitre. Ronnie Pitre lived with his wife and child and younger brother, 17-year-old Jamie. On the evening of the 12th, the Pitres, along with Jamie and Kelly, watched an evening movie. At the conclusion of the film (around 10:00 p.m.), the Pitres retired, and Kelly and Jamie left the house and went to Kelly's station wagon parked outside. Some time later, defendant approached the vehicle (there was some evidence he laid in wait in the rear seat of the car) and shot Jamie in the back of the head once and Kelly in the face once. Both died instantly.
*1277 Defendant then fled, first to Baton Rouge, and then to El Paso, Texas and Juarez, Mexico. Acting on a tip, Terrebonne Parish Sheriff's Department officers contacted the FBI, who contacted agents of the police of the State of Chihuahua, Mexico. Chihuahua state police agents arrested defendant in Juarez. The defendant orally confessed to the crime at the scene of his arrest and later signed a written confession while in custody of the Chihuahua police. The defendant was transferred to FBI custody at El Paso and returned to Houma for trial, where the jury found him guilty of two counts of first degree murder and, having found the presence of the aggravating circumstance that defendant knowingly created a risk of death or great bodily harm to more than one person, recommended a sentence of death, which the trial court imposed.
Subsequent to his sentencing, defendant filed in this court a Motion to Remand to District Court for Receipt of Evidence in Order to Enlarge the Record for Appeal. The court referred the motion to the merits. The motion raises the critical issue of whether or not the district court had personal jurisdiction over the defendant at trial. This issue is likewise raised in defendant's assignments of error and will be addressed first.

DISTRICT COURT'S JURISDICTION
Defendant's motion to remand and assignments of errors nos. 6, 7 and 8 raise issues under The Extradition Treaty between the United States of America and the United Mexican States of 1978. These issues were not raised in the district court and are raised for the first time on appeal. Defendant argues that the treaty prohibits the extradition of a person who may be subject to the death penalty in the prosecuting nation. Defendant also argues that the treaty and Mexican law prohibit the extradition of Mexican nationals and that defendant is a Mexican national. Defendant further argues that United States authorities presented a forged birth certificate to Mexican police officials indicating that defendant was born in the United States whereas he was in fact born in Mexico, thereby depriving the Mexican authorities of the exercise of their discretion under the treaty not to extradite a Mexican national.
Defendant's motion to remand asks that the case be remanded to the district court to take evidence on defendant's status as a Mexican national and to develop facts relating to the alleged false birth certificate. Attached to the motion is a document executed several years after defendant's birth which purports to reflect his birth in Durango, Mexico. Since no objection to jurisdiction was raised in the district court, the record on appeal is practically devoid of any evidence bearing on defendant's nationality.
Defendant contends that because of violations of the treaty, the Louisiana court is without personal jurisdiction of the defendant, the conviction is null, and defendant should be repatriated to Mexico. Defendant relies particularly on Articles 8 and 9 of the treaty, which provide:
Article 8:
When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting party furnishes such assurances as the requested party considers sufficient that the death penalty shall be imposed, or, if imposed, shall not be executed.
Article 9:
1. Neither Contracting Party shall be bound to deliver up its nationals, but the executive authority of the requested party shall, if not prevented by the laws of that Party, have the power to deliver them up, if, in its discretion, it be deemed proper to do so.
2. If extradition is not granted pursuant to paragraph 1 of this article, the requested party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.
The guiding legal principles were set forth in the recent United States Supreme Court case of United States v. Alvarez-Machain, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). In Alvarez, U.S. agents caused the forcible abduction of a Mexican national from *1278 Mexico to California, where he was charged with murder. Defendant there raised similar defenses to those raised here. Protests were lodged by the Mexican government. The Supreme Court, nevertheless, found the treaty inapplicable and no bar to prosecution in the United States.
The Supreme Court explained that absent a treaty, a nation is not obligated to surrender a person to another nation. The treaty between the United States and Mexico creates mutual obligations on the two nations to extradite under certain circumstances and according to certain procedures. The treaty does not prohibit a transfer of custody by other means. The treaty "does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution." The court found that the treaty did not by its terms or by implication prohibit abduction outside of the terms of the treaty or prohibit prosecution where the defendant's presence is obtained by means other than those established by the treaty. The court concluded that defendant's abduction was not in violation of the treaty and, therefore, his trial in the United States was not prohibited.
In this case, the transfer of custody of the defendant was accomplished by informal, consensual cooperation between a low-level FBI office in El Paso, Texas and local police officials in Juarez, Mexico, not through "the diplomatic channel" as specified in Article 10 of the treaty.
According to testimony, the Mexican police were presented with a warrant or detention order and a birth certificate showing that defendant was born in Durango, Colorado. Unlike in the Alvarez case, no protest under the treaty has been made by the Mexican government. Nothing in the treaty prohibits such a transfer of custody or prohibits prosecution after transfer of custody by such means. Article 8 of the treaty allows refusal by Mexico of extradition of persons who may be subjected to the death penalty, but does not prohibit such extradition. Article 9 of the treaty allows refusal by Mexico of extradition of Mexican nationals, but does not prohibit such extradition.
The treaty does not by its terms or by implication afford defendant the right to freedom from prosecution in the United States or to be repatriated under the circumstances of this case. It cannot be said that the treaty was violated even if, as claimed by defendant, U.S. officials engaged in some subterfuge in the process of the informal transfer of custody. We hasten to add that the record contains no evidence, only defendant's allegation, that a false birth certificate was used. However, even if such were the case, and if defendant is a Mexican national, the treaty affords him no relief. These assignments of error are without merit and the motion to remand is denied.

JURY INSTRUCTIONS
Defendant's argument in Assignment of Error No. 22 revolves around the jury instructions.[1] Relying on Falconer v. Lane, 905 F.2d 1129 (7th Cir.1990), defendant claims that the instructions were "wrong as a matter of law" because they "prevented the jury from considering [the mitigating factors of] `sudden passion' or `heat of blood;'" which would require a finding of guilty only on the lesser included offense of manslaughter.
Defendant argues that the jury instructions used in this case encourage a finding of guilt as charged, as opposed to a lesser offense, due to the "sequential" nature of the *1279 instructions. This means that the instructions tell the jury members that if they are "not convinced that the defendant is guilty of the offense charged, [they] may find the defendant guilty of a lesser offense." Defendant, like the Falconer court, considers that this structuring of the instructions encouraged the jurors to "move on" to consider a lesser included offense only if the requirements of the greater offense were not met. However, the instructions in Falconer differ from the instructions in the present case, rendering the Falconer analysis much less persuasive here.
As an initial matter, the Falconer decision can provide no more than persuasive authority in this court, and does not control this court's decisions, because lower federal court decisions do not bind this court's interpretations of federal constitutional law. Cf. Brecht v. Abrahamson, 507 U.S. ___, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Wright v. West, 505 U.S. ___, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). This court therefore need not adopt the Falconer analysis. The instructions read by the district court in the instant case come directly from the Louisiana Judges' Criminal Bench Book, which evidently has contained it for more than 10 years. Although this court has not specifically ruled on the instruction, lower court decisions have upheld similar instructions. See, e.g., State v. Jack, 596 So.2d 323 (La.App. 3d Cir.1992); State v. White, 544 So.2d 620 (La.App. 3d Cir.1989); Louisiana law, as far as it has treated the issue, approves of the instructions.
In any event, an independent analysis of the instructions does not indicate that jury members would necessarily interpret the instructions the way the Falconer court assumes they would. Under Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), a jury instruction violates *1280 the "Eighth Amendment require[ment] that the jury be able to consider and give effect to all relevant mitigating evidence offered" if there exists "a reasonable likelihood that the jury has applied the instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380-82, 110 S.Ct. at 1196-97. In this case, the "constitutionally relevant evidence" to which Boyde refers would be evidence of sudden passion or heat of blood. The reviewing court must examine the instruction as a whole, not merely "a single instruction... in isolation." Id., citing Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).
The jury instructions state clearly the definition of manslaughter, and plainly indicate to jurors that if they found the mitigating factors of sudden passion or heat of blood, they should find defendant guilty only of manslaughter.[2] Few jurors could be expected to interpret this set of instructions, taken as a whole, in the way defendant (and perhaps the Falconer court) suggest. An independent application of the rule of Boyde to these instructions thus leads to the conclusion that they do not contain error because they do not present "the reasonable likelihood" that jurors were prevented from considering evidence of the mitigating factors.
In sum, defendant's arguments based on the jury instruction lack merit, both because the instruction in the instant case differs materially from the instruction defendant compares it to, and because an independent application of controlling Supreme Court precedent leads to a result different than the one defendant suggests.

INTRODUCTION OF INCULPATORY STATEMENTSI
In assignment of error number 3, defendant claims that the district court erred in allowing the state to introduce testimony reflecting several inculpatory statements[3] defendant made in the weeks preceding the murders, when, he claims, the state did not give notice to the defense until the day trial began. He further claims that he suffered prejudice because the testimony supported the state's theory of premeditation, and the lack of notice deprived him of any opportunity to prepare "a defense to this evidence."[4] Though the state complied with LSA-C.Cr.P. art. 716(B), which requires it to give notice of intent to introduce "any statement of any nature, made by the defendant, which the state intends to offer in evidence at trial," defendant argues that this notice came too late.
Defendant moved for pre-trial discovery in this case and the state granted him open file discovery. However, defendant insists (without support) that the record does not show that the state's files contain information which would reveal the oral statements, and hypothesizes that the district attorney received information of the statements; *1281 that open file discovery did not afford notice to the defense; and that the state thereby did not comply with the requirement of LSA-C.Cr.P. art. 729.3 requiring it to notify the defense "promptly" that it possessed the information. Still, even if the file contained no information about the statements, and defendant received late notice of them, not every violation of discovery procedures requires reversal; before defendant can complain of such a violation, he must show prejudice. State v. Hooks, 421 So.2d 880 (La.1982); State v. Strickland, 398 So.2d 1062 (La.1981). In the instant case, defendant complains that he suffered prejudice because the statement enabled the state to convince the jury that defendant committed the murders after premeditation (thereby defeating defense attempts to show mitigation which would lead to a manslaughter conviction) and because late notice prevented the defense from mounting a defense to the statements. However, defendant cannot demonstrate prejudice because, first, other evidence showed premeditation, or at least contradicted any defense hypothesis of sudden passion or heat of blood. Second, appellate counsel has not even suggested what would have constituted "a defense to this evidence" of premeditation. In the absence of any but the most vague suggestion as to how the defense may have suffered prejudice by the late notice of intent to use inculpatory statements, and in the presence of other evidence forming an adequate basis for supporting the prosecution theory which the late-noticed evidence also supports, defendant cannot show prejudice. Therefore, under Hooks and Strickland, we hold that this assignment of error is without merit.

INTRODUCTION OF INCULPATORY STATEMENTSII
In assignment of error no. 5, defendant challenges the introduction into evidence of four inculpatory statements. The statements divide into three categories. Defendant gave the first statement to a U.S. law enforcement officer in Mexico immediately after his arrest. He gave two further statements to Mexican authorities in the days following his arrest, the first an oral statement to a police official and the second a formal written confession. Finally, he made a statement to U.S. authorities after his return to the United States. Defendant argues that the court should have admitted none of the statements, the first three because they resulted from beatings delivered by Mexican authorities and so were not freely and voluntarily given, and the fourth because defendant gave it after he indicated that he wished questioning to cease and to have an attorney present. However, under relevant federal and Louisiana jurisprudence, admission of the statements presents no error. As to the first three statements, although defendant correctly points out that under LSA-C.Cr.P. art. 703(D), "the state has the burden of proving the admissibility of a purported confession," and further points out that under LSA-R.S. 15:451, that burden includes proving that the inculpatory statement was "free and voluntary, and not made under the influence of fear, duress, [or] intimidation," the state did meet its burden. In addition, defendant volunteered the fourth statement while not under interrogation according to relevant federal and Louisiana jurisprudence, and so the court did not err in admitting it.
Testimony varied on the circumstances of defendant's arrest and first inculpatory statement. At the second hearing held on the motion to suppress, defendant's Mexican wife claimed that some 12 policemen burst into the house she shared with defendant and beat him for 30 minutes before taking him outside. At that hearing, defendant claimed that the police hit him "a few times" and then dragged him outside; he also claimed that he never even saw American law enforcement officials. On the other hand, Terrebonne Parish detective Bourgeois testified that he, along with Terrebonne Parish detective Radue, observed the arrest. In Bourgeois' version, the Mexican police were in the house "a minute or less." The Americans read defendant his Miranda rights, then Bourgeois left the scene. At trial, Detective Radue testified that the police were in defendant's house for two or three minutes; that defendant gave no sign of having been beaten and showed no blood; that he and Bourgeois read him his Miranda rights, *1282 which defendant indicated he understood; and that defendant thereupon confessed to killing the two victims. Mexican police Commandante Acosta testified at the first hearing that the officers were inside the house two to six minutes, and they did not need to use much force because they caught defendant by surprise.
Likewise, testimony varied on the circumstances surrounding the two inculpatory statements given to Mexican authorities. Defendant bases his claims of involuntariness on his contention that Mexican officials beat him not only at his arrest but also in the three subsequent days when he was in Mexican custody. He testified to that effect at the first hearing on the motion to suppress. Three other defense witnesses also testified that Mexican police had beaten defendant; one claimed to have seen the police beating defendant. In addition, the U.S. Federal Public Defender's Office took pictures of defendant on his arrival in El Paso. The pictures show marks on defendant's torso and arms which defendant claims are the results of beatings and electric shock used to induce his confession. The state countered this testimony with testimony from police who interviewed him soon after his return to the United States, and documents and photographs generated at that time. At the second motion to suppress hearing, F.B.I. agent Kline testified, and at trial both he and F.B.I. agent Van Gent testified, that defendant showed no signs of illness or injury; a form they filled out shows the same. Commandante Acosta testified that defendant was not beaten.
In both of the above situations, involving all three inculpatory statements, the testimony presented the district court with varying contentions about the circumstances of defendant's arrest and confinement in Mexico. The district court evaluated the conflicting testimony and found that nothing showed that the confessions were not voluntary.
This court, in reviewing the district court's finding of admissibility, must apply the deferential standard of review set out in State v. Baylis, 388 So.2d 713 (La.1980), which calls for an appellate court not to disturb "conclusions of a trial court as to the credibility of witnesses and the weight of testimony relating to voluntariness [of a confession].... unless they are not supported by the evidence." 388 So.2d at 716. Applying this standard to the three inculpatory statements obtained in Mexico requires affirming the district court admission of the statements because evidence of voluntariness supports the trial judge's conclusions as to all three statements.
The fourth inculpatory statement implicates a different aspect of law. Defendant and the state agree that after his return to the United States, while in F.B.I. custody in El Paso and after an F.B.I. agent read him his Miranda rights, defendant asked to see an attorney and remain silent. At that point, questioning continued, but only as to "routine background" matters such as age, marital status, and the like. When asked by Agent Van Gent, as part of a series of background questions, to give the name of any previous wives, defendant gave Kelly's name, and then stated, "That's the reason I'm here. I caught her with another man." Van Gent testified that he did not know the details of defendant's case, or that a former wife's murder figured in it. Defendant claims that the state obtained the fourth inculpatory statement in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its progeny.
This court's recent decision in State v. Abadie, 612 So.2d 1 (La.1993), applies directly to defendant's claim. There, the court noted that under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), "when an accused has asked for counsel he is not subject to further custodial interrogation without counsel present ... unless the accused himself initiates further communication, exchanges, or conversations with the police." 612 So.2d at 2. However, the court also limited "the term `interrogation' under Miranda" to "words or actions on the part of the police (other than those normally attendant on arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Abadie, 612 So.2d at 6, citing Rhode *1283 Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Abadie calls for a reviewing court to apply an "objective test," which prohibits all police conduct leading a defendant reasonably to believe "that the police are trying to get him to make an incriminating response." 612 So.2d at 6. Under this objective test, the F.B.I. agent's questioning about administrative matters should not have led defendant to conclude the police sought an inculpatory statement. In addition, the routine questions constituted "words or actions normally attendant on arrest and custody." Considering the nature of the questions and the context in which they were asked, they did not constitute investigating interrogation prohibited by Edwards v. Arizona and Abadie. Defendant's argument about the fourth inculpatory statement, like his arguments about the three earlier inculpatory statements, thus fails. We find that all four inculpatory statements were properly admitted. This assignment of error lacks merit.

THE INDICTMENT
The defendant was indicted by the Terrebonne Parish Grand Jury on January 5, 1990, for the "first degree murder of one, Jamie Pitre and Kellie Pitts Sanders." On the first day of trial, prior to its commencement, the district attorney moved to amend the indictment to charge defendant with two counts of first degree murder. After objection from defense counsel, the trial judge ruled that the amendment would not prejudice the defense in any way and allowed the state to amend the indictment as requested.
In assignment of error number 1, defendant objects to the state's amending the indictment to add a second count of first degree murder, just before the beginning of trial and without a grand jury indictment.
Under LSA-La. Const. art. 1 § 15 and LSA-C.Cr.P. art. 382(A), prosecutions for capital offenses must commence with indictment by a grand jury. According to the defendant, the second count could not be properly added without institution of prosecution anew through a grand jury indictment. Defendant therefore argues that his conviction on the second count of first degree murder is a nullity because the state charged him unconstitutionally.
We find that defendant's claim is without merit. The indictment as originally drawn charged defendant with the murder of both victims.[5] The amendment merely clarified that there were two counts, more as a matter of form than substance. The record shows that no prejudice was suffered by the defense as is evidenced by the statement made by defense counsel prior to the district attorney's motion to amend the indictment. Defense counsel stated, "Now, Mr. Sanders is charged with two counts of first degree murder ..." This indicates that both parties believed the defendant had been charged with two counts of first degree murder and that the amending of the indictment was a mere formality.
Under LSA-C.Cr.P. art. 487, the court may at any time cause the indictment to be amended in respect to a formal defect and may order an indictment amended with respect to a defect of substance at any time before the trial begins. Such amendments may include adding a charge or a count to an indictment. State v. Lovett, 359 So.2d 163 (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977). Trial does not begin for trial purposes until "the first prospective juror is called for examination." LSA-C.Cr.P. art. 761; Lovett, 359 So.2d at 167. Defendant's prosecution began with a grand jury indictment, and in conformity with arts. 487, 489 and 761, the state amended the indictment before trial. The district judge found that the amendment did not surprise the defense and made "no difference whatsoever in the preparation or the defense in any way, shape or form." We find this assignment of error is without merit.

EVIDENCE OF UNCHARGED PRIOR CRIMINAL CONDUCT
In assignment of error no. 2, defendant asserts that the trial court erroneously admitted *1284 evidence of uncharged prior criminal conduct at the guilt phase of his trial. Specifically, he claims that the court should not have admitted testimony of Kelly's sister, Angela Knight, because the state did not provide adequate notice to the defense of its intent to do so, as required by State v. Prieur, 277 So.2d 126, 130 (La.1973). Cf. LSA-C.E. art. 1103. Defendant claims that the state did not fulfill the Prieur requirements of specificity and timeliness. The testimony reveals that defendant assaulted and beat Kelly and entered the sister's home without authorization.
As to specificity, defendant has initially pointed to an arguable violation of the principles set out in Prieur, which requires the state to give notice "with the general particularity required of an indictment or information." 277 So.2d at 130. However, defendant fails to mention that the state filed a notice of intent to use inculpatory statements, which describes the conduct in detail, and satisfies the particularity requirement. Defendant's arguments about a lack of particularity ignore the fact that the title of a pleading does not matter, but rather "courts should look through the caption of pleadings in order to ascertain their substance and to do substantial justice ..." Smith v. Cajun Insulation, 392 So.2d 398 (La.1980). Defendant had detailed written notice of the other crimes evidence of which he now complains.
However, the state did not file its notice of intent to use inculpatory statements until the eve of trial. Defendant argues that the state thus violated Prieur's requirement that the state furnish notice "within a reasonable time before trial." 277 So.2d at 130. However, not every violation of pre-trial procedures (including Prieur violations) requires reversal, and before a defendant can complain of such a violation, he must show prejudice. State v. Hooks, 421 So.2d 880 (La. 1982); State v. Strickland, 398 So.2d 1062 (La.1981).[6] The record reveals that well before trial, defendant (1) had knowledge of the state's whole file via discovery (which informed defendant of the state's awareness of the prior conduct and the availability of a witness who could testify to it); (2) had knowledge of the state's intention to use prior conduct at the penalty phase. This knowledge combined to give to defendant sufficiently particular notice of the admissible other crimes evidence in enough time to prepare a defense to it. Notably, appellate counsel does not in any event suggest how trial counsel could have defended against the evidence.
In addition, counsel did not object to introduction of the testimony at trial. As this court's treatment of a situation similar to that presented by the instant case reveals, the issue of prejudice and lack of timely objection are closely linked. In State v. Clark, 492 So.2d 862 (La.1986), this court reviewed a capital case in which the defendant had independent knowledge of testimony to be offered against him at the guilt phase of his capital trial, but the state had not made the required Prieur notice. Trial counsel did not object to the testimony on Prieur grounds. The court pointed out that:
"[i]t is ... the policy of this court in capital cases to consider arguments which should have been raised in the trial court, but were not. State v. Glass, 455 So.2d 659 (La.1984), cert. denied, [471] U.S. [1080], 105 S.Ct. 2159, 85 L.Ed.2d 514, rehearing denied [472] U.S. [1033], 105 S.Ct. 3516, 87 L.Ed.2d 645 (1985). We therefore do not agree [with the state's contention] that [defendant's] failure to object precludes our consideration of the question; yet neither should a defendant, with knowledge of the state's intention to introduce such evidence and with an opportunity to prepare his defense, be permitted to withhold his objection at trial, take his chances with the jury, and assign error in this court when his gamble fails.... Under these circumstances, [defendant] cannot complain of lack of notice or a lack of opportunity to prepare his defense, and is not entitled to a mistrial on this basis.
Clark, 492 So.2d at 865 (La.1986). The court thus refused relief to a capital defendant who complained that he had not received Prieur *1285 notice of other crimes evidence introduced at the guilt phase, when the court found that defendant had "written notice ... of the state's intent to introduce the" testimony of witnesses which, it turned out, contained evidence of other crimes. Id. In the instant case, defendant had received a detailed written notice of the state's intent to use inculpatory statements, which notice detailed the Prieur conduct introduced. In these circumstances, it is reasonable to charge counsel with knowledge of the state's intention to introduce the testimony complained of in spite of a failure of Prieur-required timely notice, and also reasonable to charge his failure to object either to a tactical decision, or to the fact that counsel knew that the situation did not call for an objection because he had received notice.
In any event, the purpose behind "the policy of this court in capital cases to consider arguments which should have been raised in the trial court, but were not," Clark, 492 So.2d at 865, is judicial determination of whether the error prejudicially affected the procedural fairness or accuracy of fact finding in the case. State v. Smith, 554 So.2d at 676. Allowing defendants to escape the consequences of decisions made at trial when no prejudice resulted from the ruling complained of does not serve that purpose. In this case, defendant received notice specific enough to satisfy Prieur; the lack of timeliness did not prejudice defendant; and failure of trial counsel to object in any event vitiates any claim defendant might have about lack of notice. Defendant's assignment of error no. 2 lacks merit.

STATE'S CLOSING ARGUMENT
In assignments of error nos. 25 and 26, defendant claims that the state's closing argument at the trial phase of the trial violated his due process rights.[7] Specifically, he claims (1) that the district attorney improperly told the jury members they should think of themselves as crime victims and take a stand against crime;[8] and (2) that the district attorney improperly argued facts not in evidence.[9]Cf. LSA-C.Cr.P. art. 774 (argument to be confined to evidence admitted, lack of evidence, or conclusions drawn from evidence or lack of it).
This court has stated as a general matter that a prosecutor retains considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 870, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La.1981). Even when it has found that a prosecutor has exceeded that latitude, the court has often criticized the improper arguments without finding that they constitute reversible error. See, e.g., *1286 Byrne, supra; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Messer, 408 So.2d 1354 (La.1982). Specifically, this court will not overturn a guilty verdict on the basis of improper argument unless "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357.[10]
The remarks in the instant case, though they did inject issues broader than the guilt or innocence of defendant, in violation of LSA-C.Cr.P. art. 774, closely resemble remarks made in cases in which the court has found the remarks constitute error not worthy of reversal because they did not contribute to the verdict. See, e.g., Messer, 408 So.2d at 1357 (state closing improperly asking jurors to take a stand against crime not reversed); State v. Knighton, 436 So.2d 1141 (La.1983) (state remarks improperly referring to amount of police manpower required to investigate case not reversed); State v. Barrow, 410 So.2d 1070 (La.1982) (state closing predicting dire consequences and societal costs of acquittal not reversed). Thus, the district attorney's first set of comments, though improper, did not improperly influence the jury, and do not warrant reversal.
The district attorney's second set of comments did not violate the requirements of LSA-C.Cr.P. art. 774, which specifically allows for closing argument to contain "conclusions of fact ... the state may draw [from]... the evidence permitted.". The two comments to which defendant points are "expressly or impliedly based on the evidence" and therefore fall within the range of conclusions the state may permissibly draw during closing argument. State v. Bretz, 394 So.2d 245 (La.1981). See also State v. Clark, 387 So.2d 1124 (La.1980) (prosecutor's closing argument placing defendant at wheel of car held a "reasonable conclusion from the facts in evidence," which included evidence which placed defendant's car near scene of crime to which defendant was otherwise linked). This assignment of error lacks merit.

HEARSAY EVIDENCE
In assignments of error Nos. 4 and 18, defendant claims that the prosecution introduced irrelevant and inadmissible hearsay at the guilt phase with the specific design to prejudice defendant. Defendant points to two instances where Terrebonne Parish detective Radue described statements made by an out-of-court declarant. In the first case, the declarant attributed ownership of firearms to defendant;[11] in the second, the declarant described the process whereby defendant paid for a new car with cash and had the vehicle registered in a friend's name.
The statements elicited constitute hearsay under LSA-C.E. art. 801(C), and so were not properly admissible. However, the error was harmless, that is, the verdict "actually rendered in this trial was surely unattributable to the error." State v. Code, 627 So.2d 1373, 1384-85 (La.1993), quoting Sullivan v. Louisiana, ___ U.S. ___, ___, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). The testimony complained of reveals that defendant owned weapons, and bought a car with cash while avoiding detection. Given the lack of connexity between the testimony complained of and the crime of which the jury found defendant guilty, and the amount and quality of other evidence arrayed against defendant, the verdict "actually rendered in *1287 this trial was surely unattributable to the error." Code, 627 So.2d at 1384-85. Defendant's assignments of error nos. 4 and 18, concerned as they are with the erroneous admission of evidence at the guilt phase of trial, lack merit.

MITIGATING FACTORS
In supplemental assignment of error no. 1, defendant argues that the preponderance of evidence shows that defendant acted in response to sudden passion or heat of blood, and so under LSA-R.S. 14:31(1) he did not commit murder but only committed manslaughter. Therefore, defendant argues, under State v. Lombard, 486 So.2d 106 (La. 1986), this court must reduce his conviction to manslaughter. However, under the facts of this case, Lombard calls for this court to affirm defendant's conviction of two counts of first degree murder.
Under Lombard, an appellate court, in reviewing a defendant's claim that he proved the statutory mitigatory factors of sudden passion or heat of blood, "must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence." Lombard thus involved application of the sufficiency of the evidence standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to the defendant's burden of proving the mitigating factors necessary to reduce a murder offense to manslaughter by a preponderance of the evidence.
The evidence at defendant's trial established that defendant threatened to kill one of the victims a number of times prior to the murders; investigated and undertook a reconnaissance of the home in which the victims were staying; obtained another's vehicle to approach that home; armed himself with a 9mm handgun; and shot the two victims at short range.[12] The evidence more than adequately supports the jury's evident determination that defendant did not act in response to "sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." LSA-R.S. 14:31. Under Jackson v. Virginia, as applied in Lombard, this assignment of error lacks merit.

REMOVAL OF JURORS
In assignment of error no. 14, defendant claims that LSA-C.Cr.P. art. 798, which allows for the removal for cause of jurors who state that because of their religious beliefs they could not impose a death sentence, is unconstitutional as applied and on its face. Two veniremen did state that because of their religious beliefs they could not under any circumstances vote for the death penalty. The trial court, evidently relying on Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and on this court's decisions which in turn rely on the Supreme Court's decisions, see, e.g., State v. Tassin, 536 So.2d 402, 406-07 (La.1988); State v. Mattheson, 407 So.2d 1150, 1159 (La.1981), disqualified them. In defendant's view, though exclusion of jurors on such grounds is permissible under the federal constitution, see Witherspoon, supra, and Witt, supra, the exclusion violates LSA-Const. art. I, § 3, which prohibits all *1288 discrimination based on religious beliefs. Defendant's novel argument fails in two ways.
First, he has not even argued (much less shown) that the alleged discrimination the two jurors suffered actually constitutes religious discrimination. The record shows that the inquiry was restricted to the question of whether the veniremen could vote for the death penalty. As this court has held, the "single attitude" of opposition to the death penalty "does not represent the kind of... religious ... characteristic that underlies those groups that have been recognized as being distinctive." State v. Lowenfield, 495 So.2d 1245, 1254 (La.1985).
Second, even if the reluctance to impose the death penalty were religious in nature, this court has adopted the Witherspoon and Witt standards.[13] This court has on numerous occasions reviewed the disqualification of jurors who stated a religious basis for their inability to impose the death penalty, and has in no instance found a constitutional violation. See, e.g., State v. Sullivan, 596 So.2d 177 (La.1992); State v. Copeland, 530 So.2d 526 (La.1988); State v. Ward, 483 So.2d 578 (La.1986); Lowenfield, 495 So.2d at 1254-55. In light of this substantial jurisprudence, this assignment of error lacks merit.

PRE-TRIAL PUBLICITY
In assignments of error nos. 9 and 10, defendant claims that prejudicial pre-trial publicity warranting a mistrial infected the venire. Defendant supports this claim with testimony from the voir dire which shows that prospective jurors heard talk of defendant's guilt and read a newspaper article about the case. Specifically, defendant points to statements made by five petit jurors, which, he claims, show their exposure to prejudicial publicity.[14] Defendant further argues that the court did not do enough to prevent this infection and erroneously denied a defense motion for a mistrial.
Under LSA-C.Cr.P. art. 775, a trial court must declare a mistrial on motion of the defense when "prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to receive a fair trial." That "prejudicial conduct" can include pretrial publicity. State v. Russel, 416 So.2d 1283, 1290 (La.1982). However, "a mistrial is not warranted absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict." Id. "The determination of whether prejudice has resulted lies in the sound discretion of the trial judge." State v. Smith, 430 So.2d 31, 44 (La.1983).
In the instant case, the transcripts of the voir dire reveal that the trial judge questioned each juror who mentioned having read the newspaper article or having heard talk of the case. As to the five ultimately selected to sit on the petit jury, the individual questioning by the trial judge supports the conclusion that although the jurors had suffered exposure to the publicity, none were so impressed by it as to be incapable of rendering a fair and impartial verdict. Specifically, each of the five had only vague recollections of what he had read in the newspaper article or heard around the courthouse. The trial *1289 court found that "those that have an opinion or those that have read the newspaper and have retained anything, other than simply knowing that there's a trial Monday for this man charged with such-and-such, have been released." Under the appropriate deferential standard of review called for by Smith, the record supports his assertion. Defendant's assignments of error 9 and 10 lack merit.

ADMISSIBILITY OF STATE'S EVIDENCE AT THE PENALTY PHASE
Defendant argues in assignments of error 23, 24 and 27 that the trial court should have excluded all of the evidence the state presented at the penalty phase. Specifically, defendant asserts (1) that the state improperly introduced evidence of original charges when the defendant was convicted of a lesser charge; (2) that inadmissible hearsay alone supported attribution to defendant of another unadjudicated offense; (3) that the state improperly introduced evidence of what defendant claims was a non-felony conviction; and (4) that he received insufficient and untimely notice of the state's intention to use prior crimes evidence.
Defendant's first claim involves a conviction of aggravated assault by the Superior Court of Pinal County, Arizona in 1974. Arizona authorities originally charged defendant with two counts of assault with a deadly weapon, a more serious charge, but defendant ultimately plead guilty to the reduced charge of aggravated assault. Defendant shows that the state improperly presented evidence of the original charges despite defendant only being convicted of the lesser charge. Defendant argues that the presentation of evidence of the original charge is a violation of State v. Jackson, 608 So.2d 949 (La.1992),[15] which "specifically prohibit[s] evidence of the original charge when the conviction is for a lesser offense." 608 So.2d at 954. Defendant points to two documents to illustrate his pointan indictment for assault with a deadly weapon and a police release questionnaire showing a charge of assault with intent to commit murder. Both of these documents relate to a prosecution which resulted in a conviction on the lesser charge of aggravated assault. We find that defendant's first claim has merit.
Secondly, defendant points to certain hearsay testimony which he claims demonstrated that he owned a number of assault rifles, thereby making him guilty of the unadjudicated crime of being a felon in possession of a firearm. At trial, the state elicited testimony from a police officer who described a declarant attributing ownership of the firearms to defendant. There was no other testimony that linked the guns to defendant. Under State v. Brooks, 541 So.2d 801 (La.1989), "evidence of unadjudicated crimes at the sentencing phase of the trial will be admissible once a trial court determines... the proffered evidence is ... competent and reliable." The testimony of the police officer qualifies as hearsay under LSA-La.C.E. 801(C), and thus does not qualify as competent and reliable,[16] and was therefore not properly admissible against defendant. Defendant's second claim thus also has merit.
*1290 In defendant's third claim, he argues that the state improperly introduced evidence of a prior conviction of aggravated assault in its case in chief at the penalty phase. Defendant claims that this was a non-felony conviction and thus the introduction of this evidence violates the rule of Jackson which "limits the convictions on which the prosecutor may introduce evidence during the case-in-chief to crimes classified as felonies." 608 So.2d at 934. Though defendant cites Jackson correctly, he neglects to point out that under Arizona law, the offense to which he pled guilty, aggravated assault, did constitute a felony at the time of the offense. Az. R.S. § 13-245; Az. R.S. § 13-103. However, the crime to which he pled guilty does not constitute a crime at all in Louisiana. Then Az. R.S. § 13-241(A) defined assault as an "unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Thus, defendant pled guilty, in effect, to attempted aggravated battery, a crime not specifically designated as a crime in Louisiana. State v. Mayeux, 498 So.2d 701, 703 (La.1986). The fact that the crime constituted a felony in Arizona and does not constitute a crime at all in Louisiana raises the question left unanswered in Jackson, namely, which jurisdiction's law shall define what constitutes a felony for purposes of the Jackson limitations in a case such as this.
Although the court has not spoken directly to this question, Louisiana law does contain at least one analogous provision which sets out the criteria by which the courts of this state evaluate criminal defendants' previous convictions from other jurisdictions. The legislature has, in LSA-R.S. 15:529.1(A), set out the rule whereby only other jurisdiction "crimes which, if committed in this state, would be a felony" qualify as prior felony offenses for enhancement purposes. This court has recently interpreted that law and found that when the other jurisdiction offense for which defendant was convicted did not necessarily include conduct criminal under Louisiana law, that conviction could not lead to an enhanced penalty. State v. Michalowski, 94-1479 (La. 9/23/94), 642 So.2d 1305.
In addition, as a general matter, the well-established principle that in the absence of clear legislative (or judicial) intent, criminal statutes (or criminal jurisprudence) are to be construed in favor of the defendant, with lenity towards him, see, e.g., State ex rel. Mims v. Butler, 601 So.2d 649 (La.1992), would reinforce the view that under the Jackson rule, courts could admit only crimes which would constitute felonies in this state.[17] Therefore, we find that defendant's third claim also has merit.
As to defendant's fourth contention of lack of notice, it clearly fails under the pre-Jackson rule of State v. Ward, 483 So.2d 578 (La.1986). There, this court found that a State response to a defense discovery request revealing that the State would rely on "defendant's prior criminal record," without more, constituted sufficient notice of the state's intention to introduce prior crime evidence at the penalty phase. The court went on to point out that:
"... the notice required in the penalty phase is not as detailed as that required by LSA-C.Cr.P. 720 in the guilt phase and State v. Prieur, 277 So.2d 126 (La.1973), because in the penalty phase there has already been a determination of guilt lessening the chance that the defendant will be tried for crimes other than those charged." 483 So.2d at 588.
The same analysis would apply in the instant case because informing defendant of the state's knowledge that he had a "significant prior history of violent activity" similarly makes it "logical to conclude the defendant was not surprised by the introduction of the evidence" of the violent criminal behavior. Ward, 483 So.2d at 587. See also State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1986) (trial court correctly allowed admission at penalty phase of evidence of defendant's other criminal activity, even when defense counsel claimed to have received no *1291 notice, when testimony of defense witness made it clear that the defense knew of the criminal activity, and defense did not articulate how notice would have changed its strategy). This fourth claim also fails even under Jackson, which requires "[a]dequate notice, sufficiently detailed to allow the defendant to know the exact unrelated conduct he must be prepared to meet in the sentencing hearing," 608 So.2d at 957, because the defense had taken open file discovery. The file presumably contained documentation reflecting the other crimes, so the defense cannot complain of surprise or lack of specificity. Defendant's claims of lack of sufficient or timely notice lack merit.
As stated, three of defendant's claims about the admission of evidence of unrelated criminal conduct at the penalty phase do have merit. This court can discount the errors only if it finds that the errors were harmless, that is, if it finds that the capital sentence "actually rendered in this trial was surely unattributable to the error." State v. Code, 627 So.2d 1373 (La. 1993), quoting Sullivan v. Louisiana, ___ U.S. ___, ___, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). It cannot be said that the death penalty in this case was surely unattributable to the improper admission of evidence at the penalty phase.

INEFFECTIVE COUNSEL
Defendant presents his most compelling case in assignment of error no. 29. He claims retained trial counsel afforded him ineffective assistance at the penalty phase. A review of the record, undertaken in light of applicable jurisprudence, supports defendant's claim.
A defendant in a criminal proceeding is entitled to the effective assistance of counsel. U.S. Const.Amend. VI; La. Const. art. I, § 13; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State ex rel. Busby v. Butler, 538 So.2d 164, 167-168 (La.1988). Similarly, a defendant at the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Fuller, 454 So.2d 119, 124 (La.1984); State v. Berry, 430 So.2d 1005, 1007 (La.1983); State v. Myles, 389 So.2d 12, 28 (La.1980) (on reh'g). The role of an attorney at a capital sentencing proceeding resembles his role at trial. He must "ensure that the adversarial testing process works to produce a just result...." Burger v. Kemp, 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-3126, 97 L.Ed.2d 638 (1987).
To prevail on a claim of ineffective assistance, a defendant must show both that counsel's performance was deficient and that counsel's error prejudiced the defense. When a defendant challenges the effectiveness of his counsel at the penalty phase, the court must determine whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Unless defendant shows both a deficient performance and prejudice, the court cannot find that his death sentence resulted from a breakdown of the adversarial process which rendered the result unreliable.
In this case, at the very beginning of the sentencing phase, which immediately followed the trial, counsel admitted that he was "really not prepared for this part of the trial" because he had not foreseen a verdict of guilty on first degree murder. Although the court should be on guard against counsel's "admissions" of unpreparedness which may in fact constitute strategic decisions meant to elicit juror sympathy or to build a case for ineffective assistance on review, cf. State v. Sullivan, 596 So.2d 177, 191 n. 6 (La.1992), in the instant case the subsequent actions of trial counsel make clear that he spoke the simple truth when he said he was unprepared.
First, his opening statement, in which he admitted unpreparedness, constituted little more than an apology for this unpreparedness. Although counsel did refer to the mitigating circumstances of LSA-C.Cr.P. art. 905.5, he did not refer to any one of them specifically or describe which ones might apply to defendant's case. Second, counsel failed entirely to object to the presentation of the state's case-in-chief at the penalty phase, which as discussed above was based in substantial *1292 part on inadmissible hearsay showing defendant guilty of the unadjudicated crime of being a felon in possession of a firearm. Failure to object to the hearsay testimony not only showed defendant to have violated the terms of probation and be a felon in the possession of firearms, but also exposed the jury to the arguably unduly prejudicial effects of what the prosecutor called the "shocking" array of weapons themselves, which timely objection could have prevented. Third, counsel's own case, consisting as it did of the testimony of defendant and defendant's ex-wife, neither of whom gave any sign of being prepared to take the stand, did little more than give the state the opportunity to cross-examine them (with devastating results).[18] Counsel did not call any of the witnesses from Mexico, including defendant's present wife, who had testified at the guilt phase and the second hearing on the motion to suppress just days before. Finally, defense counsel did not make a closing argument at the penalty phase.
Under established jurisprudence, counsel's errors and omissions satisfy the first prong of the Strickland test. First, this court has held that a "perfunctory" or "lackluster" argument, or one which does not "emphasize to the jurors any of their legal obligations designed to prevent the arbitrary or capricious imposition of the death penalty, e.g. the requirement that they ... weigh any aggravating circumstances found against any mitigating circumstances" constitutes ineffective assistance. State v. Myles, 389 So.2d 12, 31 (1979). The Myles court's description fits the opening argument in this case. Second, failure to object to the introduction of damaging, obviously hearsay testimony presents a textbook unprofessional error. Cf. Clark, 492 So.2d at 872 (failure to object to introduction of evidence constitutes counsel error). Third, counsel's case at the penalty phase reflects a total failure to conduct an investigation aimed at unearthing mitigating evidence, and therefore represents ineffective assistance. Cf. State v. Sullivan, 596 So.2d 177, 191 (La.1992). Finally, failure to make a closing argument at the penalty phase constitutes ineffective assistance. This court has come close to stating that an attorney's failure to make an opening statement constitutes ineffectiveness per se. See Clark, 492 So.2d at 872 (failure to make opening statement "inappropriate" and "inexplicable"); Busby, 538 So.2d at 173 (failure to make opening statement important factor in determining whether penalty phase assistance of counsel ineffective). Counsel's failure to make a closing argument in the instant case, following the unfavorable testimony and a forceful state closing, constitutes ineffective assistance even more clearly. Counsel's inadequate performance meets Strickland's ineffectiveness prong.
As to the second prong of the Strickland test, the court must determine whether counsel's inadequate performance prejudiced defendant to the extent that the penalty phase was rendered unfair and the sentence suspect. Lockhart v. Fretwell, ___ U.S. ___, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). First, the prejudice resulting to relator from counsel's failure to object to the introduction of damaging hearsay seems clear, as it allowed the jury to see the dizzying array of weapons and to see defendant as violating the prohibition against his possessing them. Second, this court's strong language about counsel's failure to make arguments practically presumes prejudice for failure to do so. Clark, 492 So.2d at 872; Busby, 538 So.2d at 173; but see State v. Messiah, 538 So.2d 175, 184-89 (La.1988). In the instant case, as *1293 noted above, counsel's failure to do so came on the heels of a generally disastrous penalty phase and a strong state closing argument. Failure to rebut any of this negative input to the jury prejudiced defendant. Finally and more generally, counsel's failure to prepare at all for the penalty phase, which resulted in "advocacy for the defendant that was tepid and virtually non-existent." Myles, 389 So.2d at 31, to some extent brought forth the disastrous penalty phase's result, which resulted in prejudice to the defendant.
This court has noted that:
"[i]neffective assistance of counsel in the penalty phase of capital cases is a recurring problem. In many cases (including this one), defense counsel, after vigorously contesting the guilt phase, has turned the case over to the jury for penalty determination with little additional evidence or argument, perhaps because the emotional and physical strain on the sole defense counsel in the losing effort in the guilt phase lessens his ability to maintain the same performance level in the immediately following penalty phase." State v. Williams, 480 So.2d 721, 728 note 14 (La. 1985).
We find that defendant did suffer prejudice at the penalty phase of trial due to inadequate representation. Therefore, because of ineffective assistance of counsel and the admission of improper evidence at the penalty phase, we must set aside defendant's sentence and remand the case to the district court for a new sentencing hearing.

DECREE
For the reasons assigned, the defendant's convictions are affirmed. The sentence is vacated and set aside and the case is remanded to the district court for a new sentencing hearing.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur. I write separately to express my disagreement with the Court's apparent adoption of a deferential standard of review to apply to assessing whether the harm caused by improper prosecutorial argument in a capital case constitutes reversible error.
In footnote 13 of the majority opinion, the majority determines that the Chapman standard of harmless error is not applicable to determine whether the defendant's conviction should be reversed due to the clearly improper plebescite on crime made in the prosecutor's closing argument. In so stating, the majority distinguishes between the type of improper argument made in this case and improper prosecutorial argument presenting inadmissible and unsworn testimony to facts outside the record, for which Chapman harmless error analysis is the appropriate standard for assessing whether the error is reversible. See State v. Smith, 554 So.2d 676 (La.1989).
A prosecutor's reference to facts outside the record may often be more damaging than purely rhetorical argument, but that does not justify this Court's application of different harmless error standards to various types of errors and misconduct. Therefore, this Court should adhere to its precedent established in Smith and apply the Chapman harmless error rule to all errors and improper conduct in a death case. However, even applying that standard, I am convinced beyond a reasonable doubt that the prosecutor's improper argument did not contribute to the jury's finding that the defendant had not carried his burden of proof with respect to manslaughter.
NOTES
[*] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994; Calogero, C.J., not on the panel. Rule IV, Part 2, § 3.
[1] As reproduced by defendant, with emphasis added by him, they read in pertinent part:

The defendant is charged on count one with first degree murder of Kelly Pitts and Jamie Pitre. The defendant is charged on count two with first degree murder of Jamie Pitre and Kelly Pitts.
First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act. Whether criminal intent is present must be determined in light of ordinary experience.
Thus, in order to convict the defendant of first degree murder on each count you must find as to each count that:
1. The defendant killed Kelly Pitts and Jamie Pitre; and
2. That the defendant acted with the specific intent to kill or inflict great bodily harm upon more than one person.
The defendant is charged on both counts with first degree murder.
In order to convict the defendant of the offense charged as to each count you must find beyond a reasonable doubt that the state proved every element of first degree murder.
If you are not convinced that the defendant is guilty of the offense charged, you may find the defendant guilty of a lesser offense, if you are convinced beyond a reasonable doubt that the defendant is guilty of a lesser offense.
Second degree murder and manslaughter are responsive lesser offenses to the charge of first degree murder.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.
Specific intent is ...
Thus, in order to convict the defendant of second degree murder on each count you must find as to each count that:
1. The defendant killed Kelly Pitts and Jamie Pitre; and
2. That the defendant acted with specific intent to kill or inflict great bodily harm upon Kelly Pitts or Pitre.
Manslaughter is a killing of a human being when the defendant has a specific intent to kill or inflict great bodily harm but the killing is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed.
Specific intent is ...
Thus, in order to convict the defendant of manslaughter on each count, you must find on each count:
1. The defendant killed Kelly Pitts and Jamie Pitre; and
2. That the defendant had a specific intent to kill or inflict great bodily harm upon Kelly Pitts and Jamie Pitre; and
3. That the killing was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
Therefore, the following verdicts may be returned as to each count:
Guilty of first degree murder.
Guilty of second degree murder.
Guilty of manslaughter.
Not guilty.
Thus, as to each count, if you are convinced beyond a reasonable doubt that the defendant is guilty of first degree murder, your verdict should be `guilty of first degree murder.'
If you are not convinced that the defendant is guilty of first degree murder, but you are convinced beyond a reasonable doubt that the defendant is guilty of second degree murder, the form of your verdict should be `guilty of second degree murder.'
If you are not convinced that the defendant is guilty of second degree murder, but you are convinced beyond a reasonable doubt that the defendant is guilty of manslaughter, the form of your verdict should be `guilty of manslaughter.'
[2] In fact, though defendant's complaints are based on the "sequential" nature of the instructions, which he argues allows the jury to consider a lesser included offense only after deciding that not enough evidence exists to convict on the greater offense, the substantive definition of manslaughter, as differentiated from the definitions of first and second degree murder, precedes in the instructions most of the language defendant complains restricts the jury's consideration. Thus a juror forming an opinion as the instructions were read would be especially unlikely to interpret the instructions in the way defendant (and the Falconer court) suggest.
[3] The State elicited testimony from several of defendant's estranged wife's family members that defendant threatened to kill his wife, and her whole family, if she did not return to him. Testimony also indicated that relator stated, "If [I] can't have her, nobody will." R. pp. 549-552; 563-566; 574-575. The State also elicited statements from a friend of defendant that defendant was looking for where his wife was staying. R. pp. 594-96. Further testimony indicated that on the night of the killings, defendant told his ex-wife (Katherine Sanders) to pack some clothes and deliver them to Amite, La. R. p. 649.
[4] Trial counsel did not object either to the introduction of the testimony or to the tardy notice delivered by the State. In a non capital case, of course, this argument would therefore also fail because counsel did not object at trial to the introduction of the testimony about which defendant now complains. However, this opinion treats the issue without regard to counsel's failure to object at trial, in spite of the warning in State v. Clark, 492 So.2d 862, 865 (La.1986), that the policy of reviewing all errors complained of on appeal in a capital case, even in the absence of a contemporaneous objection, applies with less force to counsel's failure to object to events at trial which lead later to objections on "lack of notice or lack of opportunity to prepare [a] defense."
[5] The grand jury indictment stated that:

Norman Sanders ... did then and there unlawfully and intentionally commit first degree murder of one Kellie Pitts and Jamie Pitre in violation of La.R.S. 14:30 A.(3).
[6] Prieur speaks of the "substantial risk of grave prejudice" to a defendant arising out of inadmissible or surprise admission of other crimes evidence, but does not presume that prejudice, which is only "possible." 277 So.2d at 128.
[7] Counsel did not object at trial to the prosecutor's remarks.
[8] The remarks, as selected by the defendant, read:

If a man comes into your home and kills you, and your wife and your three kids are there, what is to prevent him from killing them if all he has to face is a second degree murder charge? Why not kill the witnesses?
If I walk into your house and I kill for no reason, by intention; I had the specific intent to kill, I kill you.
So, when a man comes in your house and he kills you, what deterrent is there for him not to kill your wife and your three children if all he has to fear is four counts of second degree murder?
We have got to have a deterrent because we don't want that man to kill your wife and three children without any fear. All he can get is one life sentence anyway. Why not kill the witnesses?
Take a look at your lives. Norman Sanders is fighting for his life. But he doesn't give a damn about the two lives he took. Well, somebody better care. If we are not our brother's keeper, then we are in serious trouble. We are all alone out there if we don't look out for one another. We have no protection from the hands of a cold-blooded, premeditated murderer like Norman Sanders.
This is our town. Listen. This is the sound of our town. Out there a message is being awaited. In this building on Main Street this is a lighthouse.... This is the lighthouse. And the beacon that must be shown is one of Justice. That is what we're here for are we not? Justice.
The killing must stop. The cure is you, the jury. Convictions. Convictions. Convictions. The prescription you must write is guilty of first degree murder on your jury verdict.
[9] The remarks, as selected by defendant, read:

Norman Sanders hunted them. He chased them. He laid in wait.
Why did he get in the back seat of the car with a 9 millimeter if you don't plan on using it?
[10] This court has recently held that the harmless error standard of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), should "also apply to the erroneous and improper arguments of a prosecutor...." State v. Smith, 554 So.2d 676 (La.1989). However, the court limited the application of the Chapman rule to prosecutorial comments which "present to the jury [the prosecutor's] inadmissible unsworn testimony to facts outside the record...." Id. The argument at issue in Smith took place at the penalty phase of trial. The court did not specifically overrule the earlier line of cases treating reversal due to improper prosecutorial closing argument as a matter requiring the reviewing court to be "thoroughly convinced" about the influence of the remarks on the jury and their contribution to the verdict. Thus, this opinion will apply the older and more deferential "thoroughly convinced" standard of Byrne, Jarman, and Messer.
[11] This passing reference to the guns at the guilt phase differed greatly from the actual in-court presentation of the numerous guns themselves, also in violation of the hearsay rule, at the penalty phase.
[12] In defendant's version, according to his penalty phase testimony and appeal brief, he approached the car and saw the victims "having oral sex." R. pp. 1031, 1044. Seeing this, he "just went crazy" and shot the pair from outside the car. Counsel notes that when the victim's bodies were discovered, Kelly's head was in Jamie's lap.

However, in addition to the evidence mentioned in the text of this report, the testimony at the guilt phase revealed that defendant told an investigating officer that he lay in wait in the vehicle before the victims entered, and shot them after listening to them "kissing and stuff." R. pp. 791. In addition, the two shell casing from the two fatal bullets were found in the front seat of the victim's car; this fact counters defendant's claim about having shot from outside the car, and buttresses the suspicion that he actually lay in wait in the car. R. p. 763. Likewise, penalty phase evidence further reveals that Jamie's body was found with his pants zipped up and his belt buckled. R. p. 1055. All of this evidence tends further to disprove defendant's manslaughter theory. In addition, that one murder victim's head fell into the lap of another victim does not lead ineluctably to the conclusion that the first was performing fellatio on the second.
[13] In addition, the legislature amended LSA-C.Cr.P. art. 798 "to conform with the decision in Witherspoon." Mattheson, 407 So.2d at 1159 n. 3.
[14] In defendant's rendition:

Juror Thibodeaux read about the case in the newspaper and heard the jurors speculating about the case in the waiting room. He stated that he had "not really" formed an opinion regarding guilt. R. 189-191. Juror Thibodeaux was on the petit jury. R. 509.
Juror Myers read the newspaper and knew that Mr. Sanders "was attempting to get an alibi." R. 446-447. She recalled many of the details from the article and overheard the jurors speculating about the case in the jury waiting room. R. 447-448. Juror Myers was on the petit jury. R. 509.
Juror Ortego was told about the case by his wife and son the day before he was examined. R. 450. He was sworn as a jury member. R. 509.
Juror Spillyards read and retained the information found in the recent newspaper article, as well as overhearing speculation in the jury room. R. 452-453. He served on the jury. R. 509.
Juror Aucoin remembers how "gruesome" the crime was from the media, and overheard the jurors' speculations. R. 466-467. He also served on the jury.
[15] Although the Jackson rule, providing as it does "more specific guidance" to district courts and additional "limitations" on LSA-C.Cr.P. art. 905.4(A)(3), announces a new rule not in effect at the time of defendant's trial, he may still avail himself of its application because this Court announced Jackson during the pendency of his appeal. Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); State v. Smith, 600 So.2d 1319, 1326 n. 5 (La.1992). However, this Court may deny defendant the benefit of retroactive application of new rules of criminal procedure it creates, in cases, like Jackson, where the rules arguably have a state constitutional basis, see, e.g., State v. Peart, 621 So.2d 780 (La.1993) (presumption of ineffectiveness of counsel "to apply prospectively only"), because this Court is not bound to adopt the Supreme Court's retroactivity analysis when deciding the applicability of a State rule. State ex rel. Taylor v. Whitley, 606 So.2d 1292, 1296-97 (La.1992). However, since Griffith, the Court has almost always applied the rule of Griffith to new state rules, at least in those cases where the decision in which the rule was announced did not state that the rule will have prospective application. See, e.g., State v. St. Pierre, 515 So.2d 769 (La. 1987) (Court gives retroactive application to rule of State v. Broussard, 490 So.2d 273 (La. 1986)).
[16] In addition, because hearsay testimony alone linked defendant to the guns, its admission into evidence without objection (even if this were not a capital case) would not prevent the Court from reviewing and excluding it, because "unobjected to hearsay which is the exclusive evidence ... is no evidence at all." State v. Allien, 366 So.2d 1308 (La.1978).
[17] Accordingly, the district court properly admitted evidence of the second conviction from Arizona which the State introduced, attempted possession of marijuana for sale, because its closest Louisiana analogue, attempted possession of marijuana with intent to distribute does constitute a felony under LSA-R.S. 40:966.
[18] The state conducted a vigorous cross-examination of defendant, which revealed, among other things, that he was selling large amounts of marijuana at the time of the murders; had $48,000 in cash and a 9mm pistol (like the weapon in the instant case) on his person when arrested in 1986 for his Arizona marijuana offense; owned a listening device capable of picking up noises from 1,000 feet; may have actually lain in wait in the rear of the car in which the victims died; and may have intimidated and thereby prevented the victim from testifying in his 1974 aggravated assault case. R. pp. 1037-1050.

Similarly, the testimony on cross-examination of defendant's ex-wife, the only other witness the defense called, damaged defendant. She admitted at the end of cross-examination that, were her daughter the victim of a crime like the one defendant perpetrated, she might not "ask this jury to give that man life imprisonment" as opposed to the death penalty. R. p. 1053.
These results contrast with the meager testimony beneficial to defendant that he and his ex-wife produced, principally defendant's halting and inarticulate plea for mercy. R. p. 1034.